UNITED STATES, Appellee,

v.

Sergeant Bret H. AUSTIN, 537–62–0984,
United States Army, Appellant.

ACMR 8801708.

U.S. Army Court of Military Review.

26 March 1991.

Reconsideration Denied April 30, 1991.

For Appellant: Ben S. Fletcher III, Esquire (argued); Captain Alan M. Boyd, JAGC (on brief).

For Appellee: Captain Mark E. Frye, JAGC (argued); Colonel Alfred F. Arquilla, JAGC, Lieutenant Colonel Daniel J. Dell'Orto, JAGC, Major Martin D. Carpenter, JAGC, Captain Gary A. Khalil, JAGC (on brief).

Before FOREMAN, JOHNSON and VARO, Appellate Military Judges.

## OPINION OF THE COURT

JOHNSON, Judge:

Appellant was tried by a general court-martial composed of officer and enlisted members and convicted, contrary to his pleas, of sodomy of a child under the age of sixteen years, and communicating indecent language to, and committing indecent acts with, a child under the age of sixteen years, in violation of Articles 125 and 134, Uniform Code of Military Justice, 10 U.S.C. §§ 925 and 934 (1982). The convening authority approved the adjudged sentence to a dishonorable discharge, confinement for ten years, total forfeitures, and reduction to Private E1.

This case arose from two incidents between appellant and his ten-year-old stepdaughter, T.S., in the family home on 27 April 1988. Appellant was charged with telling her that morning to "suck my dick," and later in the evening of the same day with fondling her breasts, buttocks, and vagina and committing anal intercourse. The charges were based on complaints first made by T.S. that same evening to her mother, Caroline Austin. T.S. subsequently made statements to doctors, a family counselor, and investigators. Although she testified in detail about the incidents at the Article 32, Uniform Code of Military Justice, investigation, at trial she recanted earlier statements and generally declined to talk about the incidents. The government then introduced her Article 32 testimony which first was read to the panel and later taken into the deliberation room, all over various defense objections.

Appellant's defense consisted of testimony tending to portray his stepdaughter as a relatively knowledgeable, somewhat manipulative little girl who often told lies and who had been "grounded" for lying just before the incident in question. Defense witnesses testified that appellant was a truthful, law-abiding individual who was an excellent soldier. He denied he had ever sodomized his stepdaughter or fondled her genitalia.

I

## VICTIM'S FORMER TESTIMONY TAKEN INTO DELIBERATION ROOM

■ Appellant makes several assignments of error, the first of which is that the military judge erred to the substantial prejudice of appellant by allowing, over defense objection, Prosecution Exhibit 3, the verbatim testimony of T.S. at the Arti-

cle 32 investigation, to be taken into the deliberation room after it was read at trial.[1]

We hold that the Article 32 testimony was properly admitted into evidence under Military Rule of Evidence [hereinafter Mil. R.Evid.] 801(d)(1)(A) as prior inconsistent testimony, that it was correct to treat it as documentary evidence that could be taken into the deliberation room, and that it was not prejudicial to appellant to have it read aloud at trial before the panel deliberated.

In support of his assignment of error, appellant asserts that the Article 32 testimony is former testimony and therefore comes within the rule that former testimony, depositions, and stipulations of expected testimony, assuming they have been properly admitted, may be read into evidence but may not be taken into the deliberation room by the panel. *See United States v. Jakaitis,* 27 C.M.R. 115 (C.M.A. 1958) and *United States v. Schmitt,* 25 C.M.R. 822 (A.F.B.R.1958), *cited in* Dep't of Army, Pam. 27–173, Trial Procedures, para. 30–2c(1) (20 April 1990). The rationale for this rule is that such documents normally are introduced as the equivalent of testimony of a witness unavoidably absent from trial or otherwise unavailable. As such, they are viewed as substitute testimony.[2]

However, when considering the Article 32 testimony of the victim in this case, we are not dealing with substitute testimony. Prosecution Exhibit 3 was introduced as a prior inconsistent statement under Military Rule of Evidence 801(d)(1)(A), which provides that a prior statement by a witness is not hearsay if "[t]he declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement" and if the statement is "inconsistent with the declarant's testimony, and was given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding, or in a deposition...." Mil.R.Evid. 801(d)(1)(A). The circumstances of this case are such that the Article 32 testimony falls within the parameters of this rule. The testimony was taken under oath at the formal pretrial investigation. There T.S. provided detailed statements which were inconsistent with her testimony at trial. T.S. was not cross-examined at trial, presumably for tactical reasons, nor otherwise questioned about her inconsistent statements. However, as Military Rule of Evidence 801(d)(1)(A) requires only that the declarant "be subject" to cross-examination concerning the prior statement, the rule was satisfied in this case.

The significance of Military Rule of Evidence 801(d) is that it makes a change from prior law where prior statements were not admissible for the truth of the matters stated therein, but only to test the credibility of witnesses. When a prior statement qualifies under this rule, it may be used as substantive evidence, not just for impeachment purposes.[3]

Appellant further asserts that an unfair advantage was gained by the government to his prejudice when the military judge permitted Prosecution Exhibit 3 to be read to the panel in open court; to be both *heard* and then seen by the panel. We disagree. There is nothing in the record to

---

1. Prosecution Exhibit 3 consists of a 15–page verbatim transcript of testimony by T.S., the first thirteen pages representing examination by the defense counsel, the last page and a half by government counsel.

2. Such documents obviously present no opportunity for confrontation, cross-examination, or observation of the declarant by the parties, the judge, or the panel members. The rule allowing substitute testimony only to be read in open court and not to be taken into the deliberation room appears to be premised on the theory that documents physically in the hands of the panel tend to be given greater weight than oral testimony of in-court witnesses. Thus, goes the argument, an unfair advantage would be given to

the proponent of an exhibit, if it were permitted into the deliberation room, over the side presenting only a witness at trial.

3. The rationale is that the trustworthiness of the prior statement is satisfied by the oath requirement, and the accuracy of the record tends to be guaranteed by the requirement that it be made at some type of formal proceeding. S. Saltzburg & K. Redden, Federal Rules of Evidence Manual, 721 (4th ed. 1986 & Supp.1989); S. Saltzburg, L. Schinasi & D. Schlueter, Military Rule of Evidence Manual 613 (2d ed. 1986 & Supp.1990); 4 J. Weinstein & M. Berger, Weinstein's Evidence 801–40, ¶ 801(d)(1)(A)[10] (1988).

suggest that the trial counsel requested the reading with some improper motive in mind. Reading the transcript during the government's case in chief is consistent with an orderly presentation of the evidence. In addition, the reading ensured that every panel member was aware of the entire content of the document and allowed them, prior to their deliberations, to consider whether they wished to direct any questions to the victim concerning her inconsistent testimony. We hold that the reading was not prejudicial to the appellant.

## II

### UNCHARGED MISCONDUCT

■ Appellant's second assignment of error asserts that the military judge erred by admitting testimony that appellant sodomized his stepdaughter in Germany in 1983, some five years prior to the charged offense. That conduct had never been the subject of charges. Appellant argues that it was inadmissible under Military Rule of Evidence 404(b). We disagree.

Evidence of the incident in Germany offered by the government initially consisted of two pages of T.S.'s Article 32 testimony (Prosecution Exhibit 3) and testimony of two witnesses relating pretrial statements made to them by T.S. Defense objections to the exhibit and the testimony were deferred for consideration at an Article 39(a), Uniform Code of Military Justice, session where, following argument by counsel, the military judge allowed evidence of the prior incident to be admitted for the limited purpose of explaining "the physical effect on the victim and her behavior" on the night of 27 April 1988 and to show that appellant "had the opportunity and the ability to commit the offense."

The evidence concerning the charged offense, the 1988 sodomy, established the following. Shortly before 2200 hours on 27 April, Mrs. Austin was ironing in the living room of their home when T.S. came downstairs. Although T.S. was mumbling and unclear at first, Mrs. Austin understood her to say that appellant had spoken to T.S. that morning in the downstairs bathroom as she was about to leave for school, telling her to "suck my dick." Skeptical that her husband had used such language, Mrs. Austin told her daughter to go upstairs but that she would listen to see if the appellant said anything similar to her and if he did, she would then confront him. T.S. went upstairs to her bedroom. Appellant called to T.S. from his bedroom, asking if she had brushed her hair. She said no, and then proceeded to the parent's bedroom and adjacent bath to get one of her mother's hairbrushes. Appellant then asked if she had changed her underwear; she replied she had not. Mrs. Austin testified that she heard her husband and T.S. discussing these matters, but nothing else that would cause her to be concerned or to intervene.

Then, according to T.S.'s testimony at the Article 32 investigation (Prosecution Exhibit 3), appellant grabbed the end of her nightgown and asked her if he could play with her vagina. She said no, but appellant then pulled her underwear down while at the same time removing his own shorts. Appellant again grabbed her nightgown, pulled her onto him, and proceeded to sodomize her. In her words, "He had his penis in my butt." She was crying because it hurt. Appellant then withdrew his penis and apparently ejaculated for T.S. saw "white stuff" come out. Appellant cleaned himself with a towel. T.S. went to her bedroom and put on clean underwear. Shortly thereafter, appellant came to her bedroom and joked with her about school and other matters.

At about this time, Mrs. Austin finished her ironing and went upstairs to go to bed. She looked into T.S.'s bedroom where appellant and T.S. were laughing and talking. She saw appellant dressed only in jogging shorts lying on the bed next to T.S., who was under the covers. She asked appellant what he was doing there; he replied that he was telling jokes, but also asked why she was so "grouchy." After appellant left the bedroom, T.S. gestured in such a way as to indicate to her mother that she needed to speak to her. They went downstairs where T.S. told her that something had happened: that appellant had kissed her, touched her about the upper torso,

pulled up her nighty, pulled down her pants, drew her onto the bed, got on top of her, and fondled her. Mrs. Austin examined her daughter but found nothing unusual. Not knowing whether to believe her daughter, Mrs. Austin did not confront appellant that evening but, since she was troubled, called her father to ask his advice.

In determining the relationship of the 1983 incident to the charged misconduct, the military judge properly applied Military Rule of Evidence 404(b) which provides that:

> Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

As stated by Chief Judge Everett, "the sole test under Mil.R.Evid. 404(b) is whether the evidence of misconduct is offered for some purpose other than to demonstrate the accused's predisposition to crime and thereby to suggest that the fact-finder infer that he is guilty, as charged, because he is predisposed to commit similar offenses." *United States v. Castillo*, 29 M.J. 145, 150 (C.M.A. 1989) (citations omitted).

The criteria established by the Court of Military Appeals for admissibility of evidence of uncharged misconduct has been summarized by three questions:

1. Does the evidence reasonably support a finding ... that appellant committed prior crimes, wrongs or acts?
2. What "fact ... of consequence" is made "more" or "less probable" by the existence of this evidence [other than a predisposition of the accused to commit crime]?
3. Is the "probative value ... substantially outweighed by the danger of unfair prejudice."?

*United States v. Rushatz*, 31 M.J. 450, 457 (C.M.A.1990) (citing *United States v. Reynolds*, 29 M.J. 105, 109 (C.M.A.1989)). Applying the criteria to this case, we hold that

the military judge properly admitted evidence that appellant sodomized his stepdaughter in Germany. We consider the three questions in detail below.

As to the first criterion for admitting uncharged misconduct, since the threshold is very low, "the military judge must admit the evidence if he concludes that the fact-finder could reasonably find by a preponderance of the evidence that the misconduct occurred, even though the judge himself would not make such a finding." *Castillo*, 29 M.J. at 151.

The testimony by T.S. at the Article 32 hearing relating the incident in Germany is unmistakably clear and highly believable. She also made consistent statements about the incident to a pediatrician (Venrick), a gynecologist (Crandall), a state family service investigator (Stockton) and a family service counselor (Randall), all of whom testified at the trial. Mrs. Austin also made out-of-court statements which corroborated T.S.'s testimony. She told the state investigator that when the family was living in Germany, upon her return home from a shopping trip, T.S. complained that her bottom was hurting. Examination of her daughter revealed lacerations around the rectum and bleeding. Confronted by his wife, appellant at first said that T.S. had injured herself in a fall, but then he changed his story and admitted, tearfully, that he had hurt his stepdaughter. Mrs. Austin made similar statements to the gynecologist and to the family counselor. Based on this evidence, a court member reasonably could find that appellant anally sodomized T.S. while the family was living in Germany. Accordingly, the military judge's determination was correct when he found that "there is a sufficient basis for the trier of fact to believe that the [incident in Germany] occurred...."

The second criterion for admitting uncharged misconduct has to do with its relevancy and the purpose for which it is offered. In view of the defense theory of the case, that a spiteful stepdaughter falsely accused appellant, there is no doubt that evidence of previous sexual abuse of T.S. by appellant, especially anal sodomy, would

tend to explain her reactions to the charged verbal abuse and sodomy. In support of his theory, trial defense counsel argued that the falseness of T.S.'s accusations were evidenced by (1) her failure to make a timely complaint; (2) her silence while allegedly being sodomized; and (3) her calm demeanor after being sexually abused. Prior sexual abuse could explain each of these points. Past abuse would tend to "condition" the victim and thus avoid shock or traumatization. It could explain why she was not compelled to immediately report appellant's "suck my dick" comment. An enlarged anal sphincter could explain why she did not cry out in pain. An examination of T.S. by Dr. Crandall several days after the incident revealed a "very relaxed" rectum that easily accommodated his finger, a condition "very unusual for an 11 year-old, or for anyone for that matter." There was expert testimony that repeated sodomizations could stretch the sphincter, a condition commonly found in homosexual men, and in women who engage in anal intercourse. Aside from the incident in Germany, there was no specific evidence presented of additional or continuing sexual abuse, although T.S. may have been discouraged by her mother to talk about other incidents.[4] Absent evidence of prior abuse, the charged offenses standing as isolated, one-time events might very well leave the panel members with too many unexplained circumstances and lead them to question T.S.'s motives and truthfulness.

■ We also note that trial defense counsel, attempting to explain how a ten-year-old could describe with such clarity the act of sodomy and the indecent language used by appellant, urged that her exposure to lewd magazines and sexually explicit video-tapes she found in the home and viewed without parental permission en-abled her to fabricate the actions and language attributed to the appellant. Trial counsel countered that in order to rebut this inference, the government should be permitted to show that the same child five years earlier, "without the benefit of five years of exposure to all the sins of the world," made an allegation of anal sodomy against appellant. The point is well taken; by attacking T.S.'s motives and truthfulness, the defense had opened the door to rebuttal. Evidence of anal sodomy upon the five-year-old T.S. in Germany would also tend to rebut defense inferences at trial that she fabricated the 1988 incident in order to get back at her stepfather by getting him in trouble.

Finally, prior sexual abuse would tend to explain why the appellant could undertake to sodomize his stepdaughter in their home even when his wife was nearby: he either anticipated that the wife would not be aware of it, or if she did learn of it, she would either not intervene or would not report him or do anything else about it.[5] We agree that the evidence of uncharged misconduct would thus assist the members to more fairly evaluate T.S.'s statements alleging sexual abuse.

In view of the above considerations, the incident of uncharged misconduct in Germany was relevant and admitted for proper reasons; accordingly, the second question of the criterion is also answered in the affirmative.

■ As to the third criterion for admitting uncharged misconduct, the military judge evaluated the evidence of appellant's uncharged misconduct and found its probative value was not substantially outweighed by the danger of unfair prejudice. Mil.R.Evid. 403. We agree. Although the evidence that appellant sodomized his stepdaughter at a very young age would tend

4. When Dr. Crandall examined T.S. two days after the 27 April incident and took her "history," he asked her if what had happened in Germany had happened subsequently. He testified that "she said, yes. And I said, can you tell me about that. And her mother said no, nothing has happened since then. And [T.S.] looked at her mother and then looked at me and said, no nothing has happened. And at that time I terminated the history. [T.S.] did not want to discuss anything further."

5. Dr. Crandall testified that during their interview Mrs. Austin had told him, with regard to the incident in Germany, that after confronting her husband at that time, appellant had promised he would never do it again, and the matter was not reported to authorities.

to inflame and prejudice a fact-finder, this circumstance does not require the conclusion of "unfair" prejudice when, as here, the "testimony is indispensable for a full understanding by the fact-finder of the transaction which has given rise to a criminal charge." *Castillo,* 29 M.J. at 151. The evidence of prior sexual abuse was highly significant and we are convinced that this evidence was properly admitted by the judge. This assignment of error is, therefore, without merit.

### III

### IMPROPER ARGUMENT BY TRIAL COUNSEL

Appellant next asserts that the assistant trial counsel's closing argument on findings was improper and unduly inflammatory, denying appellant a fair trial. However, the defense did not object to the assistant trial counsel's closing argument. Failure to make timely objection to improper argument constitutes waiver of the objection. Manual for Courts–Martial, United States, 1984, Rule for Courts–Martial 919(c).

■ Although the assistant trial counsel's argument contained words which may be considered in poor taste, we hold that they were harmless and did not rise to the level of plain error. Assistant trial counsel stated at one point that, "I think the Government has long ago met any and all burden it had to this court, to prove beyond any doubt that this man on 27 April 1988, used those words to his stepdaughter." Appellant urges that this was improper since counsel must not express a personal belief in the guilt or innocence of the accused. We do not find this to express a personal belief of appellant's guilt but rather a strong statement by the government's representative that the government had proven its case beyond a reasonable doubt. As such, it is nothing more than a statement of the traditional role of a prosecutor. Further, the assistant trial counsel referred to the trial defense counsel's argument on findings as "crap." However, neither of these statements is so egregious as to materially prejudice the substantial rights of

the accused or to have an unfair prejudicial impact on the panel's deliberations. Other portions of the assistant trial counsel's argument addressed by appellant in his brief may have been harsh or inartful but not improper or inflammatory.

### IV

### HEARSAY STATEMENTS OF A FAMILY COUNSELOR

■ Appellant next asserts that the military judge erred to his substantial prejudice by admitting over defense objection hearsay testimony of a family counselor as statements for medical diagnosis or treatment under Military Rule of Evidence 803(4). We find this assignment of error to be without merit.

Some three weeks after the offenses took place, Mrs. Austin telephoned Mr. Randall, a Social Work Services counselor at the Fort Campbell Hospital, and requested counseling for her family. She was concerned about her marriage and T.S.'s allegations of sexual abuse. One week later, Mr. Randall began counseling Mrs. Austin and T.S. At this time, T.S. knew she was receiving professional counseling. Background information about the family was provided by Mrs. Austin and T.S. as a part of the counseling. Mr. Randall was asked to testify at appellant's trial about matters told to him by Mrs. Austin and T.S. Trial defense counsel's hearsay objection was overruled by the military judge on the ground that Mrs. Austin's and T.S.'s statements were admissible under the medical treatment exception to the hearsay rule found in Military Rule of Evidence 803(4). Mr. Randall then testified as to what he had been told about the incident in Germany and about the 27 April 1988 sodomy.

■ We find that the statements made to Mr. Randall were admissible under Military Rule of Evidence 803(4). *See generally United States v. Williamson,* 26 M.J. 115, 118 (C.M.A.1988) ("statements made to a social worker for the purpose of treatment may well qualify for admission ... under Mil.R.Evid. 803(4)"); *United States*

*v. Welch,* 25 M.J. 23, 25 (C.M.A.1987) (statements made to a clinical psychologist and a senior psychotherapist qualify for admission under Mil.R.Evid. 803(3)); 4 J. Weinstein & M. Berger, Weinstein's Evidence ¶ 803(4)[01] (1988). The conditions for admissibility of hearsay under Rule 803(4) were satisfied. *See Williamson,* 26 M.J. at 118. The military judge did not abuse his discretion by admitting the testimony. Even if the military judge erred in this matter, it was harmless since the testimony was cumulative. Three other witnesses testified about the same matters, as did T.S. at the Article 32, Uniform Code of Military Justice, investigation.

## V

## INEFFECTIVE ASSISTANCE OF COUNSEL

■ Appellant's final assignment of error asserts that he was denied effective assistance of counsel because the trial defense counsel failed to call an expert witness who would have disputed the conclusion of the government's expert that evidence indicating that T.S.'s weak sphincter muscle was the result of anal intercourse and evidence of sexual abuse. Specifically, appellant argues that the failure of trial defense counsel to call Dr. John B. Pietsch as an expert witness to rebut the conclusions offered by the government witness, Dr. Crandall, was prejudicially deficient assistance of counsel. We find this contention to be without merit.

Dr. Crandall, testifying as an expert in the field of gynecology and of sexual trauma diagnoses and treatment, stated that he had examined T.S. on 29 April 1988 for the purpose of determining if she had been sexually abused. Just prior to the physical examination, he took her personal "history" during which she stated that she had been anally sodomized by appellant. The physical examination included a digital examination, the insertion of the doctor's fin-

ger into the patient's rectum. According to the doctor's testimony, this procedure involving a child is very often difficult or impossible because the normal reflex is for the sphincter to contract and tighten up and the individual to draw away. In this case, he testified, her rectum relaxed and his finger was introduced very easily. This led him to believe that "this was not something that had happened for the first time, just recently, the day before," because such relaxation of the sphincter is "very unusual for an 11 year old child, or for anyone for that matter." [6] He found no evidence of physical trauma, but this was not unusual for "only 35 to 40% of patients will show evidence of trauma." Asked to comment on the significance of T.S. having passed large diameter stools, Dr. Crandall testified that that would be consistent with prior dilation of the sphincter and frequent anal intercourse.

During extensive cross-examination by trial defense counsel, Dr. Crandall testified that large, hard stools can stretch the anal sphincter, and also the examiner's manner may cause the patient to relax and more readily allow insertion of the examiner's finger. He also stated that you can neither confirm nor disprove prior sexual abuse by rectal examination alone, unless of course the presence of semen or cells or blood of the perpetrator were found. Later, trial defense counsel called two witnesses to rebut Dr. Crandall's testimony on direct. Dr. Ronald Howard, a pediatrician, testified that he examined T.S. on 7 May 1988, that she was physically normal, and that he found no clinical evidence of sexual abuse. The doctor explained clinical evidence when asked by the military judge as follows: "Actually finding something wrong ... and say that this child has been abused. We see children frequently and we have had cases of children in day care centers who have been abused over a long period of time, and find absolutely nothing on physical exam.... I'm sure that probably 9 out

---

**6.** Dr. Crandall testified that such relaxation of the sphincter muscle occurs in only one to three percent of women. In his practice, he found that "a relaxed sphincter is common among those adults who engage in rectal intercourse or anal sodomy." The sphincter is a doughnut-shaped muscle which like any striated muscle can be stretched and dilated. It can be "taught to be stretched and relaxed," he observed.

of 10 children that are sexually abused have no physical evidence of it." Doctor Howard stated that he could not "allow" that sexual abuse had occurred.

The next defense witness, Dr. Deborah Venrick, testified that she had examined T.S. on 28 April 1988 and found her rectal sphincter to be within normal limits. When she inserted her finger the sphincter muscle tightened and appeared to have moderate muscle tone. She further testified that she found no evidence "conclusive for sexual abuse."

To support his contention that trial defense counsel was ineffective by failing to call Dr. Pietsch, appellant submitted an affidavit from that doctor. It states that Dr. Pietsch would have testified that a rectal digital examination, in his opinion, would not be conclusive of sexual abuse, and that there may be other reasons for the alleged victim's weak rectal sphincter muscle not related to sexual abuse.[7] Comparing this to the testimony of Dr. Crandall, we find that the expected testimony of Dr. Pietsch would not have rebutted that of Dr. Crandall, but rather would have been cumulative with the latter's testimony. On cross-examination, Dr. Crandall observed that his diagnosis was based primarily (eighty to ninety percent) on what he was told by T.S., and that a rectal digital examination is not conclusive as to sexual abuse. Dr. Crandall agreed that his examination did not establish that T.S. had been anally sodomized. Further, he agreed that the examiner's finger is more easily admitted into the patient's rectum if that individual is relaxed and that hard, large stools can stretch the sphincter. The significant testimony of Dr. Crandall, that of finding T.S.'s sphincter very relaxed, which tended to confirm his belief of prior sexual abuse, was rebutted by defense expert witnesses Doctors Howard and Venrick who testified that T.S.'s rectal sphincter was within normal limits. Dr. Pietsch could not have rebutted Dr. Crandall's examination obser-

vations because Dr. Pietsch never examined T.S.

Trial defense counsel considered and rejected calling Dr. Pietsch. His reasoning is set out in his affidavit admitted by this court:

Central to the decision not to make a request for the employment of Doctor Pietsch as an expert witness was the fact that [he] could not rule out anal sodomy as one explanation for the loose sphincter tone noted by Doctor Crandall. Doctor Pietsch had not examined the victim nor was he necessarily recognized as an expert in this area. Of course, Doctor Crandall relied on more than just this one observation to conclude abuse had occurred. Much importance was placed on the victim's timely complaint. Having Doctor Pietsch conclude that he would have made a more thorough examination or performed other procedures would not outweigh the damaging testimony sure to be elicited from him on cross-examination. Certainly the physician could provide a measure of favorable testimony on direct examination to support the defense theory of the case. However, if cross-examined by trial counsel, Doctor Pietsch could be expected to testify that one sign of anal sodomy is often a stretched or loose anal muscle. While there is no objective measure of standard of looseness, a physician who performed hundreds of these tests over his career, as had been done by Doctor Crandall, would develop a sense of what a loose muscle was. He also would be asked to quantify how many loose muscles were the result of abuse versus the result of enlarged stools or conscious relaxation. The answer would suggest the remote likelihood that the noted condition was attributable to something other than sodomy. Dr. Pietsch would acknowledge the value of the victim's fresh complaint, her demeanor and reactions while being examined, and the medical history she

---

7. The trial defense counsel inquired about this point in a conversation with Dr. Peitsch before appellant's trial. He stated in an affidavit that Dr. Pietsch suggested two explanations for the observations of Dr. Crandall other than anal

sodomy: "Among the alternate explanations for the laxity of the sphincter muscle were the size of the child's stool (e.g. chronic constipation) and the state of mind of the victim when examined. (i.e. if put at ease)."

provided during the examination as essential factors for a physician to consider in making a diagnosis. He would be required to admit he neither examined the victim nor was he a recognized expert in the diagnosis of sexual abuse cases; in a 'credentials battle' with Doctor Crandall he would fare second best. It could be expected that his testimony would be discounted to the extent it conflicted with Doctor Crandall's. The net effect of the testimony would be to corroborate and emphasize much of what Doctor Crandall testified to; to the extent that there was an innocent explanation for the physical findings of the government expert, Doctor Pietsch would acknowledge the unlikelihood of such an explanation.

The dilemma was to adduce the favorable defense testimony without opening the door for a potentially very damaging cross-examination. [I] believed [I] could through cross-examination of Doctor Crandall, raise the issues suggested by Doctor Pietsch....

We conclude that trial defense counsel's tactical decision was based on sound reasons. Moreover, prior to appellant's court-martial, trial defense counsel advised appellant of his tactical decision. On appeal, appellant does not contend that he objected to this decision. Trial defense counsel's decision not to call Dr. Pietsch was well within the bounds of reasonable judgement and we will not second-guess him. *United States v. King,* 28 M.J. 855 (A.C.M.R.1989), *petition denied,* 29 M.J. 329 (C.M.A.1989); *United States v. Kelley,* 19 M.J. 946, 947 (A.C.M.R.1985), *petition denied,* 20 M.J. 195 (C.M.A.1985); *United States v. Bowie,* 17 M.J. 821, 824 (A.C.M.R.1984), *aff'd,* 21 M.J. 453 (C.M.A.1986), *cert. denied, Bowie v. United States,* 479 U.S. 820, 107 S.Ct. 83, 93 L.Ed.2d 37 (1986). In applying the tests in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), to this case, we hold that appellant was not denied effective assistance of counsel.

The findings of guilty and the sentence are affirmed.

Senior Judge FOREMAN and Judge VARO concur.