UNITED STATES, Appellee,

v.

Sergeant Jimmie RUDOLPH, United States Army, Appellant.

ACMR 9001552.

U.S. Army Court of Military Review.

31 July 1992.

For Appellant: Michael S. Katz, Captain Michael W. Meier, JAGC (on brief).

For Appellee: Colonel Dayton M. Cramer, JAGC, Lieutenant Colonel Daniel J. Dell'Orto, JAGC, Major Joseph C. Swetnam, JAGC, Captain Marcus A. Brinks, JAGC (on brief).

Before JOHNSON, WERNER, and GRAVELLE, Appellate Military Judges.

## OPINION OF THE COURT

JOHNSON, Senior Judge:

Contrary to his pleas, the appellant was convicted by a general court-martial composed of officer and enlisted members of two specifications of rape, in violation of Article 120, Uniform Code of Military Justice, 10 U.S.C. § 920 (1982) [hereinafter UCMJ]. He was sentenced to a bad-conduct discharge, confinement for fifteen years, forfeiture of $624.20 pay per month for 180 months, and reduction to Private E1. The convening authority approved only so much of the forfeiture as provided for forfeiture of $624.00 pay per month for 180 months, and otherwise approved the sentence.

The appellant asserts, *inter alia*, that the military judge erred by admitting three pretrial statements made by the victim and the appellant and allowing the testimony of a doctor concerning statements made by the victim. He further asserts that the evidence is insufficient to support a finding of guilty to one of the rape specifications. Except for the grounds on which one of the victim's statements was admitted, we disagree and affirm.

### I.

At the time of his conviction, the appellant was twenty-eight years old and had been in military service for ten years. The victim, T, was his stepdaughter. The rapes allegedly took place on divers occasions in Germany from January 1987 (when T was seven years old) until February 1988 (Specification 1), and in Columbus, Georgia from February 1988 until January 1990 (Specification 2). These offenses came to light when the appellant was taken into custody by civilian police on Sunday evening, 14 January 1990, following the report of an alleged assault on T's girlfriend TB. T made a statement to a police investigator that evening. Because T indicated at that time that the appellant had intercourse with her only two days before, she was taken to a hospital and examined by a doctor. As the appellant had been drinking, the investigators decided not to interrogate him Sunday evening. He was confined until late the next afternoon, Monday, 15 January, when he waived his rights and made a statement. The next day he was brought before the local Recorder's Court. T appeared at that proceeding and testified briefly under oath. Later, T testified under oath at the Article 32, UCMJ, hearing. She also testified at the appellant's court-martial, but essentially recanted her earlier statements of her stepfather's abuse, refused to discuss the incidents, or offer reasons why she had previously told untruths.

T's first statement was made to Detective Wurst of the Columbus police late on the Sunday evening of the appellant's arrest. In a verbal, unsworn statement recorded on a cassette tape and later transcribed, she said in pertinent part that her stepfather "got on top of me," "stuck his penis in me," (in her private area which she described as "my front"), that "if I didn't let him he was gonna whup me with a board," and that "he made me suck his penis." She said that the intercourse had been going on "ever since we were in Germany," and in Columbus since "we first moved," which was about "three and a half years" ago. In response to a question, she said she had not told her mother because she was afraid her stepfather would hurt her. A second statement was made by T at the Columbus Recorder's Court two days later where she acknowledged, in response to questions from the judge, that the appellant had been "messing around" with her and had sexual intercourse with her.

T's third statement was made some two months later at the Article 32 investigation. There, under oath, she changed her story about what had happened between the appellant and her girlfriend TB on 14 January. She admitted that the appellant did things to her that she didn't like but refused to be more specific. She confirmed to the investigating officer that she told the truth when she made the statement to the police. When the investigating officer let her read the transcript of that statement, she said it was true and didn't want

to change it. Later, when recalled, T was asked to read the statement again and make any corrections. She complied and, except for some words she crossed out which did not concern the rape offenses, she again confirmed that everything else was correct. In response to questions from the investigating officer, she said the appellant had done things to her that a father should not do to a daughter, and that it had to do with sex, but refused to be more specific.

At trial T denied that her father had done anything "bad" to her in Germany, and acknowledged that she had previously said that he had done so. She did say that she was afraid that her father might go to jail. She then refused to respond to more specific questions regarding her stepfather's actions in Germany or in Georgia.

## II.

■ Considering first T's testimony at the Article 32 hearing, we hold that it was properly admitted at trial as a prior inconsistent statement under, Manual for Courts–Martial, United States, 1984, Military Rule of Evidence 801(d)(1)(A) [hereinafter Mil.R.Evid.]. That rule provides that a prior statement by the witness is not hearsay if "the declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement" and if the statement is "inconsistent with the declarant's testimony, and was given under oath subject to penalty of perjury at a trial, hearing, or other proceeding...." The Article 32 testimony falls within the parameters of this rule. The testimony was taken under oath and recorded verbatim at the formal pretrial investigation.

■ During her sworn testimony at the Article 32 hearing, T was on two occasions shown a transcript of her verbal, recorded statement to the Columbus police (her first statement discussed above), which she read and, except for crossing out some thirty words pertaining to an alleged offense not pertinent to this appeal, confirmed that her statement was true and correct. The appellant's defense counsel cross-examined T about that statement. Both the govern-

ment and the defense counsel, as well as the investigating officer, apparently understood that she was adopting the statement. *See United States v. Ortiz*, 33 M.J. 549, 553 (A.C.M.R.1991) (adoption of statement at Article 32 is "prior testimony"). Nothing in the transcript of T's testimony at the Article 32 hearing suggests otherwise. The investigating officer testified that he viewed it as sworn testimony. That was why he had her read it, make any changes, and confirm its truthfulness.

Under the circumstances, we find that T adopted her prior statement as part of her testimony. As such, it was admissible, together with the Article 32 testimony, as a prior inconsistent statement under Mil. R.Evid. 801(d)(1)(A). *See United States v. Connor*, 27 M.J. 378, 389 (C.M.A.1989); *United States v. Austin*, 32 M.J. 757, 759 (A.C.M.R.1991). It follows that the audio cassette recording of her verbal statement was also admissible, and it was not error for the military judge to allow the panel to hear it. We also hold that T's brief statement to the judge at the Recorder's Court acknowledging that her stepfather had intercourse with her was admissible as it qualified as prior inconsistent testimony under the same rule.

■ Though admissible as indicated above, we nevertheless hold that it was error for the military judge to admit T's statement to the Columbus police as residual hearsay under Mil.R.Evid. 803(24). We are persuaded that under the circumstances, including the fact that T was unsworn and neither the appellant nor his counsel were present, that the reliability of the statement was not of a level to satisfy the stringent test of "equivalent circumstantial guarantees of trustworthiness" required to justify the residual hearsay exception. *See United States v. Giambra*, 33 M.J. 331 (C.M.A.1991); *United States v. Palacios*, 32 M.J. 1047 (A.C.M.R.1991). However, in view of our holding above that the same statement was admissible as a part of the Article 32 testimony, the error was harmless and the appellant was not prejudiced.

### III.

The appellant next asserts that the military judge erred when he permitted a medical doctor to testify under the medical diagnosis or treatment exception to the hearsay rule (Mil.R.Evid. 803(4)), as to statements made by T during the "rape" examination. We disagree. After recording T's statement to the investigator at police headquarters, the police took T and her mother to the city medical center for an examination of the child. The nurse on duty obtained a brief history from T and then took hair and fluid samples that were to be provided to the police. She was then introduced to Dr. Saucier who took additional history and performed a physical examination. At trial, Dr. Saucier testified that as a result of his examination he concluded that T had had some type of repeated vaginal entrance (the vaginal cavity was unusually large for a child of ten). This was consistent with the history she had given to the doctor about her stepfather's periodic intercourse over a number of years.

The appellant contends that the doctor's testimony regarding T's statements was inadmissible because they actually were made to the nurse rather than to the doctor and, in the alternative, because the government failed to show that T made the statements with the expectation of receiving some medical benefit from the examination. Upon reading Dr. Saucier's testimony, we are satisfied that it was based upon information he obtained directly from T. Statements under the medical treatment exception, Mil.R.Evid. 803(4), must meet two conditions: they must be made for medical, diagnostic or treatment purposes; and the patient must expect some medical benefit from the diagnosis or treatment when making the statements. *United States v. Edens*, 31 M.J. 267 (C.M.A. 1990); *United States v. Williamson*, 26 M.J. 115 (C.M.A.1988); *United States v. Deland*, 22 M.J. 70 (C.M.A.), *cert. denied*, 479 U.S. 856, 107 S.Ct. 196, 93 L.Ed.2d 128 (1986). There may be some relaxing of the quantum of proof when a child is being treated. *Edens*, 31 M.J. at 269.

In the present case, T knew she was in a hospital and knew she was talking to a doctor for he identified himself as such and was wearing a doctor's white coat. Having just come from making a statement to the police about sexual abuse, and having been asked similar questions by the nurse as part of the "history," there can be no doubt that she understood why she was being examined and that his questions were to assist in his diagnosis as he conducted the physical examination. The doctor testified that he customarily advises the patient that the examination is to ensure that she is "okay." He also testified that he asked T about the perpetrator of the abuse and the length of time the incidents had occurred to "determine how I need to take care of my patients, what's going on, what I need to look for in my examination, and how I need to take care of [T] mentally and physically." The record amply supports our conclusion that T understood that the questions were designed to help the doctor in his examination, diagnosis and treatment, and that he was doing this to help her. The doctor's testimony solidly rebuts the appellant's contention that the sole purpose of the examination was to gather evidence for prosecution purposes.

In addition to his testimony indicated above, Dr. Saucier also testified that his examination varied little from a normal examination, the difference being the taking of hair or fluid samples for the police which, in any event, is done by the nurse, and that he paid little or no attention to who brought the victim in—it didn't change his procedures. We therefore hold that the testimony of the doctor was properly admitted and that the military judge did not abuse his discretion.

### IV.

The appellant next asserts that the military judge erred when he denied the appellant's timely motion to suppress his statement to the civilian police made on Monday, 15 January 1990, the day after he was arrested. The appellant asserted that his waiver of his right against self-incrimination was not voluntary, knowing, and intelligent, in violation of his *Miranda* rights.

*Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

The military judge heard testimony from the two police officers who took his statement, and from the appellant. The testimony of the officers established that they advised the appellant of his rights when he was brought into the station on Sunday evening, 14 January 1990, and that he then signed a waiver form. After determining that the appellant was somewhat intoxicated, they discontinued the interview. The appellant made no inculpatory statements and did not request an attorney. Some eighteen hours later, on 15 January, the interview was resumed and the appellant was again advised of his rights. One of the police officers, a woman, showed him the pertinent part of the Georgia Code in order to advise him of the potential maximum punishment for the offenses alleged against him. She also advised him to "come clean." The appellant was cooperative, again signed a form waiving his rights, and made a statement. Both officers emphatically denied using force or making promises to induce the appellant to make a statement.

The appellant testified that the officers promised to help him if he made a statement. He admitted that he understood his rights on both days he was questioned, that he was not mistreated in any way, and that they did not suggest he lie. He also admitted that he did not tell his public defender, who represented him the next day at the Recorder's Court, about the alleged promises.

The military judge made findings of fact and denied the motion. He found that the police officers had testified truthfully, whereas he found the appellant's testimony regarding police offers to help him, and promises of leniency and possible immunity, not credible. He also found that while the police officers had encouraged him to tell the truth, the appellant was fully aware of the consequences of a statement and its potential use against him; that he therefore made a knowing, conscious, intelligent, and voluntary waiver of his rights

on both days; and, that there was no fact or circumstance caused by or participated in by either officer such as to overcome the free exercise of the accused's will to waive his rights. We agree that the appellant knowingly waived his rights and made a voluntary confession.

■ On appeal, the appellant does not renew his argument that his *Miranda* rights were violated, but rather urges for the first time that, under Georgia law, the alleged police promises made his confession involuntary and therefore inadmissible. We find this argument absolutely without merit. In any event, not having been raised at trial, it was waived. Manual for Courts–Martial, United States, 1984, Rule for Courts–Martial 905(e).

## V.

■ We also disagree with the appellant's assertion that the government failed to prove that the offense of raping T in Germany occurred after January 1987 and therefore within the statute of limitations which is five years.[1]

Although T was not precise as to dates, her statement to the Columbus police and her comments to Dr. Saucier confirmed that the appellant had sexual intercourse with her in Germany. The appellant was stationed in Germany from 1985 to 1988. His confession reads in part:

> Sometime in 1987, while I was stationed in Germany, I started messing with my daughter, [T]. She was about seven years old at the time. It started off just feeling on her and then I ended up having intercourse with her. When this happened in GERMANY, my wife would be home, but she would be asleep.

The appellant thus admitted that the intercourse began in 1987. Since T was in fact seven years old during the first seven months of 1987 (until she turned eight on 30 July), the appellant's reference to her age in his confession appears to confirm that the intercourse began early in 1987. We are convinced beyond a reasonable doubt that the evidence legally and factual-

---

**1.** *See United States v. Holt,* 33 M.J. 400, 404 n. 5 (C.M.A.1991).

ly establishes that the appellant committed rapes in Germany within the period charged. *See Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *United States v. Turner,* 25 M.J. 324 (C.M.A.1987). It was, therefore, well within the five-year statute of limitations.

We have considered the remaining assignment of error and the personal assertions of the appellant raised pursuant to *United States v. Grostefon,* 12 M.J. 431 (C.M.A.1982), and find them to be without merit.

The findings of guilty and the sentence are affirmed.

Judge WERNER and Judge GRAVELLE concur.